**ORAL ARGUMENT REQUESTED**

Case No. 7:21-cv-02807-CS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re

53 STANHOPE LLC, et al.,[1]

Debtors.

BROOKLYN LENDER LLC,

Appellant,

-v.-

53 STANHOPE LLC, et al.,

Appellees.

Appeal from the United States Bankruptcy Court for the
Southern District of New York, Bankr. Case No. 19-23013 (RDD)

## BROOKLYN LENDER LLC'S BRIEF ON APPEAL

---

[1]      The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: 53 Stanhope LLC (4645); 55 Stanhope LLC (4070); 119 Rogers LLC (1877); 127 Rogers LLC (3901); 325 Franklin LLC (5913); 618 Lafayette LLC (5851); C & YSW, LLC (2474); Natzliach LLC (8821); 92 South 4th St LLC (2570); 834 Metropolitan Avenue LLC (7514); 1125-1133 Greene Ave LLC (0095); APC Holding 1 LLC (0290); D & W Real Estate Spring LLC (4591); Meserole and Lorimer LLC (8197); 106 Kingston LLC (2673); Eighteen Homes LLC (8947); 1213 Jefferson LLC (4704); 167 Hart LLC (1155) (collectively, the "Debtors").

**KASOWITZ BENSON TORRES LLP**
David S. Rosner (drosner@kasowitz.com)
Jennifer S. Recine (jrecine@kasowitz.com)
Matthew B. Stein (mstein@kasowitz.com)
Andrew H. Elkin (aelkin@kasowitz.com)
Tiffany L. Ho (tho@kasowitz.com)
1633 Broadway
New York, NY 10019
Telephone No.: (212) 506-1700
Facsimile No.: (212) 506-1800

*Counsel for Brooklyn Lender LLC*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellant Brooklyn Lender LLC is a limited liability company.  It has no parent corporation and no public corporation owns 10% or more of interests in the company.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

JURISDICTIONAL STATEMENT ..........................................................6

STATEMENT OF ISSUES PRESENTED ON APPEAL .........................................7

STATEMENT OF THE CASE ..................................................................8

    A.    The Mortgages ..............................................................8

    B.    The Debtors' False Statements Concerning Ownership ....................10

    C.    The Debtors' False Statements Concerning Strulovitch's Net Worth and Cash Flow ...................................................15

    D.    The Importance of Accurate Representations Concerning Ownership ................................................................16

    E.    The Undisclosed Owners' Control over the Collateral ....................20

    F.    The Encumbrance Defaults ................................................21

    G.    The Bankruptcy Cases .....................................................22

    H.    The Bankruptcy Court's Rulings ..........................................23

        1.    Ruling on the Ownership Defaults .........................................23

        2.    Ruling on the Bankruptcy Defaults .......................................26

        3.    Ruling on the Encumbrance Defaults .....................................26

STANDARD OF REVIEW ...................................................................27

ARGUMENT ................................................................................27

I.    THE BANKRUPTCY COURT ERRED IN DETERMINING THAT THE OWNERSHIP DEFAULTS ARE NOT ENFORCEABLE UNDER NEW YORK LAW. ...................................................27

    A.    The Bankruptcy Court Applied the Wrong Legal Standards In Determining that the Ownership Defaults Are Not Enforceable ........28

B.     Defaults For False Statements of Ownership Are Enforceable Because They Necessarily Impair the Lender's Security and Make Payment of the Loan Less Likely .............................................31

C.     The Bankruptcy Court's Determination that the Ownership Defaults Were Not Enforceable Were Based On Clearly Erroneous Factual Findings and a Misapplication of the Law. ..........34

D.     The Bankruptcy Court Erred By Disallowing Default Interest On Account of the Ownership Defaults .....................................................42

E.     Allowing the Bankruptcy Court's Ruling to Stand Would Erode the Stability of Scores of Credit Agreements Providing that a Material Misrepresentation By the Borrower In Connection With the Loan Is An Event of Default ........................................................46

II.     THE BANKRUPTCY COURT ERRED BY DISALLOWING DEFAULT INTEREST ARISING FROM THE BANKRUPTCY DEFAULTS. ..................................................................................................48

III.     THE BANKRUPTCY COURT ERRED IN LIMITING DEFAULT INTEREST ON THE ENCUMBRANCE DEFAULTS. .............................52

CONCLUSION ..........................................................................................................54

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*100 Eighth Ave. Corp. v. Morgenstern*,
  164 N.Y.S.2d 812 (App. Div. 1957)...................................................................40

*In re 1111 Myrtle Ave. Grp., LLC*,
  598 B.R. 729 (Bankr. S.D.N.Y. 2019)..........................................................44, 50

*In re 139-141 Owners Corp.*,
  313 B.R. 364 (S.D.N.Y. 2004) .........................................................................53

*In re 785 Partners LLC*,
  470 B.R. 126 (Bankr. S.D.N.Y, 2012)..........................................................42, 51

*ASM Capital LP v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*,
  582 F.3d 422 (2d Cir. 2009) ..............................................................................27

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
  No. 11 CIV. 2375(JSR), 2011 WL 5335566 (S.D.N.Y. Oct. 31,
  2011) ...................................................................................................................46

*Babitt v. Vebeliunas (In re Vebeliunas)*,
  332 F.3d 85 (2d Cir. 2003) .................................................................................27

*Beacon Fed. Sav. & Loan Ass'n v. Marks*,
  457 N.Y.S.2d 881 (App. Div. 1983)...................................................................32

*Blomgren v. Tinton 763 Corp.*,
  238 N.Y.S.2d 435 (App. Div. 1963)...................................................................40

*Bonady Apartments, Inc. v. Columbia Banking Fed. Sav. & Loan Ass'n*,
  472 N.Y.S.2d 221 (App. Div. 1984)...................................................................32

*In re Bownetree, LLC*,
  No. 1–08–45854–dem, 2009 WL 2226107 (Bankr. E.D.N.Y. July
  24, 2009) .............................................................................................................51

*CBS Inc. v. Ziff-Davis Publ'g Co.*,
  553 N.E.2d 997 (N.Y. 1990)...............................................................................37

*Chase Manhattan Bank v. Motorola, Inc.*,
  184 F. Supp. 2d 384 (S.D.N.Y. 2002) ................................................................47

*In re CPG Constr. & Dev. Corp. v. 415 Greenwich Fee Owner, LLC*,
  No. 102055/10, 2012 WL 10057890 (N.Y. Sup. Ct. Mar. 12,
  2012), *aff'd*, 986 N.Y.S.2d 467 (App. Div. 2014).............................................28

*Cruden v. Bank of N.Y.*,
  957 F.2d 961 (2d Cir. 1992) .............................................................................43

*In re Downtown Athletic Club of N.Y.C., Inc.*,
  No. 98-B-41419-JLG 1998 WL 898226 (Bankr. S.D.N.Y. Dec. 21,
  1998) ...........................................................................................................30, 45

*Empire State Bldg. Assoc. v. Trump Empire State Partners*,
  667 N.Y.S.2d 31 (App. Div. 1997)....................................................................41

*In re Enron Corp.*,
  302 B.R. 463 (Bankr. S.D.N.Y. 2003), *aff'd*, No. 04-CIV.1367
  (NRB), 2005 WL 356985 (S.D.N.Y. Feb. 15, 2005)..........................................46

*Fid. Fed. Sav. and Loan Ass'n v. de la Cuesta*,
  458 U.S. 141 (1982)......................................................................................8, 32

*Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*,
  389 N.E.2d 113 (N.Y. 1979)..............................................................................29

*First Nationwide Bank v. Brookhaven Realty Assocs.*,
  637 N.Y.S.2d 418 (2d Dep't 1996)..................................................................1, 48

*Fontainebleau Las Vegas, LLC v. Bank of Am., N.A. (In re
  Fontainebleau Las Vegas Holdings, LLC)*,
  417 B.R. 651 (S.D. Fla. 2009) ...........................................................................48

*In re Gen. Growth Props., Inc.*,
  451 B.R. 323 (Bankr. S.D.N.Y. 2011)....................................................49, 50, 53

*Gillman v. Chase Manhattan Bank, N.A.*,
  521 N.Y.S.2d 729 (App. Div. 1987), *aff'd*, 543 N.E.2d 824 (N.Y. 1988).........30

*Graf v. Hope Bldg. Corp.*,
  171 N.E. 884 (N.Y. 1930)..................................................................................29

*Greenfield v. Philles Records, Inc.*,
   780 N.E.2d 166 (N.Y. 2002)..................................................................43

*In re Heavey*,
   608 B.R. 341 (Bankr. E.D.N.Y. 2019) ...............................................45

*Jamaica Sav. Bank, FSB v. Ascot Owners, Inc.*,
   665 N.Y.S.2d 858 (App. Div. 1997).....................................................42

*Jamaica Sav. Bank v. Cohan*,
   320 N.Y.S.2d 471 (App. Div. 1971).......................................30, 31, 45

*Karas v. Wasserman*,
   458 N.Y.S.2d 280 (App. Div. 1982)......................................................40

*Key Bank Nat'l Ass'n v. Milham (In re Milham)*,
   141 F.3d 420 (2d Cir.), *cert. denied*, 525 U.S. 872 (1998) ...............42

*Key Int'l Mfg., Inc. v. Stillman*,
   480 N.Y.S.2d 528 (App. Div. 1984), *aff'd as modified on other
   grounds*, 489 N.E.2d 764 (N.Y. 1985) .........................................29, 30

*MBIA Ins. Corp. v. Credit Suisse Sec. LLC*,
   No. 603751/2009, 2020 WL 7041787 (N.Y. Sup. Ct. Nov. 30,
   2020) .................................................................................................39, 40

*Mcnerney v. Rescap Borrower Claims Tr. (In re Residential Cap.,
   LLC)*, 563 B.R. 477 (S.D.N.Y. 2016), *aff'd sub nom. Gray v.
   ResCap Borrower Claims Tr.*, 706 F. App'x 16 (2d Cir. 2017)..............6, 10, 11

*Metro Funding Corp. v. West LB AG*,
   No. 10 CIV.1382 (CM), 2010 WL 1050315 (S.D.N.Y. Mar. 19,
   2010) .......................................................................................................46

*Metzen v. United States*,
   19 F.3d 795 (2d Cir. 1994) ....................................................................35

*In re N.W. Airlines Corp.*,
   No. 05–17930 (ALG), 2007 WL 3376895 (Bankr. S.D.N.Y. Nov.
   9, 2007) ...................................................................................................51

*Newburgh Sav. Bank v. Grossman*,
   462 N.Y.S.2d 92 (N.Y. Sup. Ct. 1982)................................................33

*NML Capital v. Republic of Argentina*,
  952 N.E.2d 482 (N.Y. 2011)...................................................................28, 52

*Pfeiffer v. Silver*,
  712 F.2d 799 (2d Cir. 1983) ..................................................................35, 36

*PHL Variable Ins. Co. v. Town of Oyster Bay*,
  No. 16-CV-4013 (SJF)(AKT), 2017 WL 2371188 (E.D.N.Y. May
  30, 2017) ...................................................................................................46

*In re Residential Cap., LLC*,
  508 B.R. 851 (Bankr. S.D.N.Y. 2014)...........................................................50

*Rockaway Park Series Corp. v. Hollis Automotive Corp.*,
  135 N.Y.S.2d 588 (N.Y. Sup. Ct. 1954).........................................................41

*Ruskin v. Griffiths*,
  269 F.2d 827 (2d Cir. 1959), *cert. denied*, 361 U.S. 947 (1960) ..........42, 49, 50

*Schonberg, et al. v. Strulovitch, et al.*,
  Case No. 17-cv-02161 ....................................................................................13

*Silver v. Rochester Sav. Bank*,
  424 N.Y.S.2d 945 (App. Div. 1980)................................................................31

*Stith v. Hudson City Sav. Inst.*,
  866, 313 N.Y.S.2d 804 (Sup. Ct. 1970).........................................31, 33, 34, 35

*In re Sultan Realty, LLC*,
  No. 12-12-0119 (SMB), 2012 WL 6681845 (Bankr. S.D.N.Y. Dec.
  21, 2012) ...................................................................................................52

*Tunnell Publ'g Co. v. Straus Comm'ns., Inc.*,
  565 N.Y.S.2d 572 (App. Div. 1991)................................................................41

*Union Estates Co. v. Adlon Constr. Co.*,
  116 N.E. 984 (N.Y. 1917)..............................................................................42

*United States v. United States Gypsum Co.*,
  333 U.S. 364 (1948)......................................................................................27

*In re Vest Assocs.*,
  217 B.R. 696 (Bankr. S.D.N.Y. 1998)............................................................50

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
   807 N.E.2d 876 (N.Y. 2004).................................................................28

*Wells Fargo Bank, N.A. v. Weidenbenner (In re Weidenbenner)*,
   No. 15-CV-244 (KMK), 2019 WL 1856276 (S.D.N.Y. Apr. 25, 2019)............27

*In re Woodmere Invs. Ltd. P'ship*,
   178 B.R. 346 (Bankr. S.D.N.Y. 1995)..................................................43

*Zona, Inc. v. Soho Centrale LLC*,
   704 N.Y.S.2d 38 (App. Div. 2000)...............................................39, 40

**Statutes**

11 U.S.C. § 365(e)(1)...........................................................................26

11 U.S.C. § 506(b) .............................................................26, 27, 48, 54

28 U.S.C. § 158(a) ..................................................................................6

**Other Authorities**

1 Bergman on New York Mortgage Foreclosures § 4.11 (2020) ...........................32

1 D. Kirk Drussel, et al., Mortgages and Mortgage Foreclosure in
   N.Y. § 28:13 (2020)........................................................................32

OFAC, *Enforcement Information for October 5, 2018*, *available at*
   https://home.treasury.gov/system/files/126/jpmc_10050218.pdf .....................38

Appellant Brooklyn Lender LLC ("Brooklyn Lender") respectfully submits this brief on appeal of the Bankruptcy Court's bench ruling and order dated February 19, 2021 (the "Bench Ruling" and "Order," respectively), which disallowed portions of Brooklyn Lender's claims against the Debtors.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This appeal presents the question of whether the clear and unambiguous terms of loan agreements, entered into by sophisticated parties represented by counsel, should be enforced. They should, especially where, as here, representatives of the borrowing single-purpose limited liability companies ("LLCs") lied about their ownership structure in loan applications submitted to a federally regulated bank in breach of the loan agreements.

The Bankruptcy Court refused to enforce the parties' agreements, even though it found that the borrowers misrepresented and concealed their ownership at loan origination, intentionally encumbered mortgaged properties without the lender's consent, and filed petitions for bankruptcy relief—each an event of default which the loan agreements provide is a basis for acceleration and accrual of default interest. The Bench Ruling and Order are predicated on multiple errors of law and fact, each of which are grounds for reversal.

*First*, the Bankruptcy Court erred in denying Brooklyn Lender's contractual right to accelerate, and to recover default interest, arising from the Debtors'

ownership misrepresentations (the "<u>Ownership Defaults</u>").  The Bankruptcy Court incorrectly held that New York courts prohibit a lender from accelerating, and accruing default interest, on account of this type of default.  It did not cite any case prohibiting such acceleration or accrual, and this specific issue appears to be a matter of first impression under New York law.

It is clear, however, that New York courts would (and should) enforce acceleration and the accrual of default interest under these circumstances.  New York law recognizes that contracts between sophisticated parties are enforced according to their terms—especially in the context of real property transactions, where commercial certainty is paramount.  Instead of enforcing the contract as written, the Bankruptcy Court determined that New York courts, in the exercise of their equitable powers, do not enforce non-monetary defaults unless such defaults impair security or make repayment less likely.  This is incorrect.  Even in equity, courts may not deny enforcement of a contractual acceleration provision in the absence of fraud, bad faith, or unconscionable conduct.  Here, the Bankruptcy Court correctly found that the Debtors misrepresented their ownership.  Under the contract, Brooklyn Lender was entitled to accelerate and recover default interest in the face of these misrepresentations.  Seeking to enforce bargained-for contract terms is neither unconscionable nor done in bad faith.

Even assuming that the Bankruptcy Court was correct in its articulation of New York law (which it was not), the Bankruptcy Court's ruling should be reversed because, as a matter of New York law, the Ownership Defaults do impair the lender's security and make payment of the loan less likely. Under New York law, the transfer of control of the collateral securing a loan without the lender's consent impairs (i) the lender's security and (ii) the likelihood that the lender will be repaid on the loan. For instance, acceleration on a due-on-sale clause is strictly enforced in New York because it allows the lender to determine who they wish to accept as a borrower and owner of the security.

The Ownership Defaults here are enforceable for the same reason. Record evidence shows that the original lender, Signature Bank ("Signature"), sought to identify its borrower by expressly and repeatedly soliciting accurate and complete disclosure of ownership and requiring the Debtors to certify and warrant that such representations were a material inducement to making the loans in the first place. The Debtors' misrepresentations prevented Signature from freely choosing its borrower; accurately assessing its ability to be repaid on the loan; and choosing who controls its collateral. Moreover, as the Bankruptcy Court recognized, Signature is required to comply with anti-money laundering ("AML") and Know Your Customer ("KYC") regulations by identifying the natural persons with whom it is dealing. These laws, which require financial institutions to collect beneficial ownership

information for legal entity customers, are intended to safeguard the financial system from abuses of financial crimes, including terrorist financing, money laundering, and other fraud and illicit activity. The Debtors' failure to disclose complete and accurate ownership prevented Signature from obtaining accurate customer information and thus exposed Signature to significant risk of liability.

Further, even if the Bankruptcy Court were correct that equitable considerations here permit it to refuse to enforce acceleration (which it was not), the Bankruptcy Court erred by conflating the standards for acceleration and default interest. Equitable considerations have no place when it comes to the enforcement of default interest provisions. Such provisions represent the contractual allocation of risk between sophisticated parties, and it is well-recognized under New York law, and in this Circuit, that lenders would charge higher interest rates throughout the life of loans if they could not be certain that default provisions would be enforced. Courts may not cancel default interest that has accrued even where the default is non-monetary, and a lender is entitled to such interest without regard to actual damages. There is no exception for non-monetary defaults that purportedly do not impair a lender's security or the ability to be repaid.

The Bankruptcy Court's ruling that a lender cannot accelerate a loan or recover default interest based on a default for a material misrepresentation about ownership, despite the plain terms of the contract, would erode the stability of

numerous credit agreements that contain similar provisions. It would render illusory contract terms designed to ensure that lenders know who is borrowing from them, exposing lenders to tremendous potential liability and undermining commercial certainty around the industry-wide mechanism used to encourage candid disclosure by borrowers. And if the Bankruptcy Court is right, lenders will have no means of ensuring that borrowers make true, accurate, and complete representations at loan origination or in statements furnished under a loan. That is not, and cannot be, the law. Indeed, courts applying New York law enforce default provisions substantially similar to the default provision at issue here.

**_Second_**, the Bankruptcy Court erred in determining that Brooklyn Lender is precluded from recovering default interest arising from the Debtors' filing of the bankruptcy petitions (the "Bankruptcy Defaults"). The law in this Circuit is clear that payment of post-petition default interest, where provided for under the agreement, is required where debtors are solvent and the payment would not harm any unsecured creditors. This is the case even where debtors are current on payment and the only default is the filing of the bankruptcy petitions. Each of the cases cited by the Bankruptcy Court is distinguishable, because all of them involved insolvent debtors.

**_Third_**, the Bankruptcy Court erred by limiting Brooklyn Lender's recovery of default interest with respect to certain Debtors' placement of secondary

encumbrances on the collateral (the "Encumbrance Defaults").  Acceleration is the advancing of a loan's maturity date so that payment of the entire debt is due immediately.  The Bankruptcy Court, by partially disallowing default interest, de-accelerated the loans and reinstated their original maturity date.  Having determined, however, that Brooklyn Lender validly accelerated the Debt on account of the Encumbrance Defaults, the Bankruptcy Court may not de-accelerate the Debt or reinstate the original maturity date without requiring the Debtor to pay interest at the default rate through the date of the reinstatement.  Moreover, the Debtors' failure to pay the debt in full, once accelerated, is a payment default further entitling Brooklyn Lender to interest at the default rate.  Payment defaults are enforceable under New York law.

For the reasons set forth herein, the Bankruptcy Court's disallowance of Brooklyn Lender's claims with respect to the Ownership Defaults and the Bankruptcy Defaults, and partial disallowance with respect to the Encumbrance Defaults, should be reversed.

## JURISDICTIONAL STATEMENT

Brooklyn Lender appeals the Bankruptcy Court's order disallowing portions of Brooklyn Lender's claims.  This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a).  *Mcnerney v. Rescap Borrower Claims Tr. (In re Residential Cap., LLC)*, 563 B.R. 477, 485 (S.D.N.Y. 2016) (order disallowing bankruptcy claim

is a final order), *aff'd sub nom. Gray v. ResCap Borrower Claims Tr.*, 706 F. App'x 16 (2d Cir. 2017).

## STATEMENT OF ISSUES PRESENTED ON APPEAL

1.      Whether the Bankruptcy Court erred as a matter of fact and law in determining that Brooklyn Lender was not entitled to (i) accelerate the loans on account of the Debtors' misrepresentations of ownership at origination and (ii) recover default interest related to such defaults, where the parties' loan agreements provide for such acceleration and default interest?

2.      Whether the Bankruptcy Court erred as a matter of law in determining that Brooklyn Lender was not entitled to recover post-petition default interest on account of the Debtors' filing of petitions for bankruptcy relief, where the Debtors are solvent and the parties' loan agreements provide for such interest?

3.      Whether the Bankruptcy Court erred as a matter of law in limiting Brooklyn Lender's recovery of default interest on account of Debtors 618 Lafayette LLC and Eighteen Homes LLC's placement of subordinate encumbrances on their properties to the period during which the encumbrances remained of record, where the Bankruptcy Court determined that Brooklyn Lender validly accelerated the loans on account of these defaults?

## STATEMENT OF THE CASE

### A.    The Mortgages

Between 2012 and 2016, Signature made 14 loans to the Debtors (each a "Loan" and collectively, the "Loans") secured by mortgages on the Debtors' real estate located in Brooklyn, New York (each a "Mortgage" and collectively, the "Mortgages").[2]  The Mortgages set forth events of default that make the Debt (as defined in the Mortgages)[3] due and payable at the option of the lender.  (*See, e.g.*, A.[4] 2-53–2-54.)

Paragraph 18(g) of each Mortgage ("Paragraph 18(g)") provides that the Debt will become due and payable at the option of the lender:

> if any representation or warranty of the Mortgagor or of any person (a "guarantor") guaranteeing payment of the Debt or any portion thereof or the performance by the Mortgagor of any of the terms of the notes, the Mortgage or this Agreement, made herein or in any such guaranty or in any certificate, report, financial statement or other instrument furnished in connection with the making of the notes, the Mortgage, this Agreement or any such guaranty, shall prove false or misleading in any material respect.

---

[2]    Brooklyn Lender's 18 proofs of claim each attach the underlying loan documents.  Given that "the underlying loan documents are basically in the same form" with "substantially similar" terms (Bench Ruling at 6-7), Brooklyn Lender includes in the appendix submitted herewith (the "Appendix") the proof of claim against 834 Metropolitan Avenue LLC as a representative example.

[3]    Debt is defined as "the principal with interest thereon and all other sums due pursuant to this Agreement and secured by the Mortgage."  (A. 2-58.)

[4]    "A. __" refers to the page numbers of the Appendix submitted herewith.

(A. 2-54.)

Paragraph 9 of the Mortgages provides that the Debt will become due and payable at the option of the lender upon "any other transaction that constructively transfers the beneficial ownership of the Mortgagor or the Mortgaged Property." (A. 2-52.)  Together, Paragraphs 9 and 18(g) require that the individuals identified by the Debtors in loan documents and documents provided at loan origination (the "Loan Documents") did hold and would continue to hold the economic interest in the subject properties (the "Mortgaged Properties").

The Mortgages also provide that the Debt will become due and payable at the option of the lender:

> (i) . . . if any petition for bankruptcy, reorganization or arrangement pursuant to the Federal Bankruptcy Code or any similar federal or state statute shall be filed by or against the Mortgagor or any guarantor . . . upon the same not being discharged, stayed or dismissed within ninety (90) days; . . .
>
> (q) if the Mortgaged Property is encumbered by any mortgage lien other than the lien of the Mortgage; . . . .

(A. 2-54–2-55.)  Upon acceleration, all amounts due under the Loans must be repaid, and the interest accrues at the default rate of 24% per annum (the "Default Rate") from the date of the underlying default.  (A. 2-56.)

On May 17, 2017, Signature assigned the Mortgages and other Loan Documents to Brooklyn Lender, shortly after Brooklyn Lender made Signature

aware about possible ownership misrepresentations.  (A. 17-20–17-21 at ¶¶ 37–38.)

By that time, Signature had already advised the borrowers that it would not extend

the loans' maturity as a result of the borrowers' history of late payments.  (*Id.*; *see*

*also* A. 28-1–28-3.)

Brooklyn Lender placed the Debtors on notice that events of default had

occurred pursuant to, among others, the foregoing provisions because (a) the Debtors

made false and misleading statements to Signature at loan origination and (b)

encumbered certain Mortgaged Properties without the lender's prior written consent.

(A. 17-22 at ¶ 39.)  In June of 2017, Brooklyn Lender informed the Debtors that it

was accelerating the Debt on account of the defaults and demanded payment in full.

(*Id.*)

### B.  The Debtors' False Statements Concerning Ownership

As part of the loan application, each Debtor was required to submit a "list of

the persons and/or entities that own interests in the Borrower" (the "Ownership

Schedule"); each borrower's organizational documents to "confirm[ ] the

information contained within the Ownership Schedule" (the "Operating

Agreements"); and a certificate "certifying that the information contained in the

Ownership Schedule is true, accurate, and complete as of the Closing Date" (the

"Ownership Certification," and with the Ownership Schedule and Operating

Agreements, the "Ownership Representations").  (A. 17-19 at ¶ 34; *see also* A. 21-1–21-2, 21-18.)

In most cases, the Debtors represented that Strulovitch was the only "person[] and/or entit[y] that own[s] interests" in the Debtors.  (A. 17-14–17-15 at ¶ 28).  In other cases (with the exception of Debtor C & YSW LLC), the Debtors represented that Strulovitch held 95% or more of interests in the Debtors.  (*Id.*)  These representations were false.  The Bankruptcy Court found that the Debtors failed to accurately disclose their ownership—as reflected in the Debtors' tax returns—to Signature at loan origination.  (Bench Ruling at 34, 37.)

The Debtors' representations of ownership, and the actual ownership reflected in their tax returns, is as follows:

| Debtor/Borrower | Ownership Representations | Actual Ownership in Year of Loan Origination |
|---|---|---|
| APC Holding 1 LLC ("APC Holding") | Strulovitch – 100% | Imre Oberlander ("I. Oberlander") – 50% Strulovitch – 50% |
| 1213 Jefferson LLC ("1213 Jefferson") | Strulovitch – 100% | CSRE LLC ("CSRE") – 55% Jefferson Operations LLC – 45% |
| Eighteen Homes LLC ("Eighteen Homes") | Strulovitch – 100% | Herman Greenfeld ("Greenfeld") – 50% Strulovitch – 50% |
| 618 Lafayette LLC ("618 Lafayette") | Strulovitch – 100% | CSRE – 55% 618 Lafayette Operations LLC – 45% |
| 167 Hart LLC ("167 Hart") | Strulovitch – 100% | CSRE – 50% |

|  |  | Nachman Strulovitch – 50% |
|---|---|---|
| 106 Kingston LLC ("106 Kingston") | Strulovitch – 100% | CSRE – 55% Kingston Operations LLC – 45% |
| 325 Franklin LLC ("325 Franklin") | Strulovitch – 100% | CSRE – 55% 325 Franklin Operations LLC – 45% |
| 53 Stanhope LLC ("53 Stanhope") | Strulovitch – 100% | CSRE – 55% 53 Stanhope Operations LLC – 45% |
| 1125-1133 Greene Ave LLC ("1125-1133 Greene") | Strulovitch – 100% | Moses Guttman ("Guttman") – 50% Strulovitch – 50% |
| 92 South 4th Street LLC ("92 South 4th") | Strulovitch – 100% | Guttman – 50% Strulovitch – 50% |
| 834 Metropolitan Avenue LLC ("834 Metropolitan") | Strulovitch – 100% | Guttman – 50% Strulovitch – 50% |
| D&W Real Estate Spring LLC ("D&W") | Strulovitch – 99% Joshua Wagschal ("Wagschal") – 1% | Wagschal – 100% |
| Meserole and Lorimer LLC ("Meserole and Lorimer") | Strulovitch – 99% Joshua Wagschal – 1% | Wagschal – 100% |
| 119 Rogers LLC ("119 Rogers") | Strulovitch – 99% Moses Strulovitch – 1% | Strulovitch – 85% Moses Strulovitch – 15% |
| 127 Rogers LLC ("127 Rogers") | Strulovitch – 99% Moses Strulovitch – 1% | Strulovitch – 85% Moses Strulovitch – 15% |
| 55 Stanhope LLC ("55 Stanhope") | Strulovitch – 100% | CSRE LLC – 50% 53 Stanhope Operations LLC – 50% |
| C & YSW, LLC ("C&YSW") | Strulovitch – 50% Joshua Wagschal – 50% | Strulovitch – 50% Wagschal – 50% |
| Natzliach, LLC ("Natzliach") | Strulovitch – 95% Wagschal – 5% | Strulovitch – 95% Wagschal – 5% |

(A. 11-2–11-3; *see also* A. 30-1–30-5.)  The Debtors' other books and records and admissions in legal proceedings further established that the Ownership Representations were false.  (A. 17-28–17-35 at ¶¶ 48–58.)

The Debtors also failed to disclose at loan origination that dozens of indirect investors (the "Israeli Investors") own interests in certain Debtors through Jefferson Operations LLC, 618 Lafayette Operations LLC, Kingston Operations LLC, and 325 Franklin Operations LLC (the "Operations LLCs").  (A. 17-16–17-17 at ¶¶ 29–30, 17-32–17-33 at ¶ 55; Bench Ruling at 37.)  The Israeli Investors' ownership interests came to light in a series of lawsuits they brought against the Debtors, beginning with a lawsuit captioned *Schonberg, et al. v. Strulovitch, et al.*, Case No. 17-cv-02161, commenced on April 10, 2017 in the U.S. District Court for the Eastern District of New York (the "Federal Action").  (*See* A. 17-11–17-12 at ¶¶ 22–23, 17-32–17-33 at ¶ 55.)  The Israeli Investors alleged that Strulovitch and his partner Mici Oberlander ("M. Oberlander") engaged in a scheme to fraudulently induce them to invest $20 million for the acquisition and development of particular real estate.  (A. 24-3–24-5 at ¶¶ 1–11, 24-7 at ¶ 20.)  In exchange, the Israeli Investors were promised membership interests in the Operations LLCs and certain other LLCs and 45% of profits from the properties.  (*Id.*)

According to the complaint, Strulovitch and M. Oberlander misappropriated the investment funds and funneled the monies to themselves and their other

properties.  (A. 24-4–24-5 at ¶¶ 7, 9.)  Strulovitch committed "bank fraud" by misrepresenting himself to banks as the "sole member" of LLCs that held the various investment properties and improperly pledged the properties as collateral on those loans.  (*Id.*; *see also* A. 24-21 at ¶¶ 92, 94.)  The Federal Action allegations made apparent that (1) Strulovitch acted as a "syndicator," *i.e.*, that Strulovitch would sell ownership interests in "his" LLCs to investors to help fund the purchase of the mortgaged properties; (2) the Federal Action plaintiffs were undisclosed owners of certain Debtors as well as a number of other LLCs purportedly owned by Strulovitch; and (3) Strulovitch took out unauthorized loans misrepresenting himself as the "sole member" of the borrower LLC.

The Israeli Investors' interests in Debtors 1213 Jefferson, 618 Lafayette, 106 Kingston, and 325 Franklin are memorialized in a second set of secret operating agreements maintained by the Debtors (the "Undisclosed Operating Agreements"). (A. 17-32 at ¶ 55.)[5]  In each instance, the Undisclosed Operating Agreements post-date the false operating agreements that the Debtors provided to Signature to "confirm[] the information contained within the Ownership Schedule," and yet were deliberately withheld from Signature.  (*Id.*; *see also* A. 12-2–12-3.)

---

[5]     Additional Israeli Investors are reflected in Schedule A of the Second Amended Complaint in the Federal Action and Exhibit H of the Amended Complaint in another action brought by the Israeli Investors against the Debtors' affiliates.  (A. 24-45–24-50, A. 29-1–29-3.)

Strulovitch testified that the Debtors intentionally elected not to disclose these agreements:  "For us, this agreement wasn't working. . . . It couldn't work, because we couldn't get loans from the bank according to this agreement. . . . And then we figured out that we can't use this agreement, because we can't get loans, because we can't get 50 people getting a loan from Signature."  (A. 5-129:07–5-131:01.) Because of this non-disclosure, Signature was unaware that Strulovitch did not own any direct interest in these Debtors, or of the existence of CSRE LLC, the Operations LLC, and the numerous foreign owners with whom it was dealing.  Likewise, Signature was not aware of I. Oberlander, Greenfeld, Nachman Strulovitch, 53 Stanhope Operations LLC, Allen Stein, and Guttman's interests in the other Debtors, or the true nature or extent of Wagschal and Moses Strulovitch's ownership interests.

### C.    The Debtors' False Statements Concerning Strulovitch's Net Worth and Cash Flow

Because the Debtors claimed that Strulovitch was the Debtors' sole or 95%, or more, equity holder (with the exception of C&YSW), the Debtors were required to provide Strulovitch's personal financial statement (the "Signature PFS") so that Signature could assess each Debtors' creditworthiness.  The Signature PFS purported to show, among other things, Strulovitch's ownership of the Debtors and other LLCs; Strulovitch's net worth, calculated based on his ownership share of the various LLCs; and cash flows payable to Strulovitch, also calculated based on his ownership share of the various LLCs.  (*See, e.g.*, A. 19-1–19-20.)

The Signature PFS generally claimed that Strulovitch owned 100% of the Debtors and other LLCs, but in fact Strulovitch owned 50% or less of the direct interests in those LLCs, and thus greatly overstated his net worth and the cash flows available to him.  (A. 19-5–19-7.)  The Debtors certified that the Signature PFS "will be relied upon," and that "[i]t shall be an event of default if anything in this statement turns out to have been false as of the date of this statement."  (A. 19-1.)

**D.  The Importance of Accurate Representations Concerning Ownership**

The Loan Documents expressly and repeatedly solicited accurate and complete disclosure of the Debtors' owners and provided that the Debtors' representations concerning ownership were material.  As part of the loan origination, among other things, Signature required each Debtor to:

- Provide a certified Ownership Schedule, a list of "the persons and/or entities that own interests in the Borrower";

-  "[R]epresent and warrant to the Bank that the information contained in the Ownership Schedule is true, accurate and complete as of the date of this Commitment";

- Provide its operating agreements, fifteen days before the Closing Date, to "confirm[] the information contained within the Ownership Schedule";

- To execute on the Closing Date, "a certificate in favor of the Bank certifying that the information contained in the Ownership Schedule is true, accurate and complete as of the Closing Date";

- "[A]cknowledge that *the identity of the person with whom the Bank deals is of material importance to it*."

(*See, e.g.*, A. 21-1–21-2 (emphasis added).)

Kenneth Stagnari ("Stagnari"), Signature's corporate representative, confirmed at trial that Signature is "required to know the ownership structure, who is within the ownership structure." (A. 8-93:11–8:94:10; *see also* A. 8-40:20–25 ("[W]hen we are underwriting a loan, we . . . look to see what the ownership structure is so we know who owns the loan, who the main principals are.").) He testified that Signature looked for and relied on the Operating Agreements to get comfort that the ownership representations are accurate. (A. 8:95:02–19.) Moreover, at closing, each of the Debtors executed the required Ownership Certifications, in which each Debtor "certif[ied] and warrant[ed] to Signature Bank" that "the ownership schedule previously submitted to the Bank is true, accurate and complete" "*[i]n order to induce Signature Bank . . . to make a first mortgage loan.*" (*See, e.g.*, A. 23-2 (emphasis added).)

Stagnari testified to two reasons why it was "***very material***" for Signature to know all individuals and entities within the Debtors' ownership structure. (A. 8-93:11–8-97:04 (emphasis added).) First, Signature was required to comply with Office of Foreign Asset Control ("OFAC") and KYC regulations. (A. 8-93:19–8-94:10.) To comply with the law, Signature needed to know whether it is "doing business with a convicted criminal or international terrorist," as well as whether it is dealing with "investors that are in foreign countries." (*Id*.) Stagnari was clear that

bank policies require the underwriting officer to, at minimum, "run an OFAC check on every individual in every entity within the borrowing structure."  (A. 8-97:02–04, 8:104:23–8-105:23 ("if we find out they have an ownership interest, an equity stake anywhere within the ownership structure, no matter how much subentities there are . . . I think as a matter of bank standard policy that we need to know that, and we'd run an OFAC on it.").)

Second, Stagnari testified that accurate disclosure of the borrower's ownership is important to Signature's credit analysis.  (A. 8-95:02–8-96:20.) Signature considers the net worth of the borrower's principal to be "important" in deciding whether to originate the loan, and requires a "personal financial statement so we know who we are dealing with." (*Id.*; A. 8-40:17–19.)  The accuracy of the personal financial statement is important.  (*Id.*)  Stagnari explained, "*[W]e like to know the financial wherewithal of our clients. We like to know they have experience in real estate investment and real estate management.* . . . I wouldn't want to give a 10 million-dollar loan to somebody that only owns one property and has a net worth of 5 bucks." (A. 8-96:3–11 (emphasis added).)

Signature's credit offering memoranda ("COM Reports")[6] reflect that Signature actually relied on the Debtors' representations of ownership and the net

---

[6]     According to Stagnari, the COM Report "summarizes everything we know about the property, the sponsor, the collateral value, the repayment risk, cash flow,

worth, experience, and cash flows of the owner (Strulovitch) in determining whether to approve the loan. (*See, e.g.,* A. 25-1–25-34.) Signature expressly determined that financial "[c]ontributions from the principal," Strulovitch, were an additional "Source of Repayment," in addition to rental income or sale/refinance of the security property. (A. 25-28). Signature assessed Strulovitch's net worth based on "his share of net equity" in properties listed in his personal financial statement, and cash flows available to him "based upon his ownership percentages" of those properties. (A. 25-9, 25-23.) Signature concluded, based on these assessments, that the "diverse critical mass of real estate investments of owner" and the "demonstrated experience and knowledge of owner" would "offset[]" the "potential negative impact" of shortfalls in income, such as a vacancy in the building securing the loan. (*Id.*) Loan approval was "recommended" based on "the extensive holdings, allocated property cash flows, and experience of the principal." (A. 25-11, 25-30.)

The borrowers' false representations infected Signature's credit analysis. For instance, because Guttman was not disclosed as a 50% owner, Signature could not (i) assess Guttman's control over the properties, and whether it would have required his personal financial statement; (ii) run the required OFAC check on him; and (iii) assess Guttman's experience in real estate or whether he could cover a shortfall in

---

and basically tells us the whole story on why a certain loan was supported and why we are seeking approval." (A. 8-42:07–22.)

rental income and properly maintain the collateral.  Strulovitch's net worth and cash flows, and thus the creditworthiness of the borrower and ability to cover shortfalls, were greatly exaggerated.  Further, because Strulovitch was a 50% owner, and not the sole owner as represented, his incentive to contribute funds from other properties, in the event of a vacancy or other shortfall, were lower.   The Debtors' misrepresentations and omissions similarly infected Signature's credit analysis for each of the other loans.

### E.    The Undisclosed Owners' Control over the Collateral

Record evidence demonstrates that certain of the individuals and entities reflected in the tax returns, but not disclosed to Signature, exercise control over the Debtors and the Mortgaged Properties.  The Bankruptcy Court found that "[b]oth Mr. Strulovitch and Mr. Wagschal acknowledged that Mr. Wagschal has a greater interest in [D&W and Meserole and Lorimer] than was disclosed . . . in connection with the loan applications for those Debtors."   (Bench Ruling at 36.)   The Bankruptcy Court determined that while "titular ownership of these Debtors was transferred in large measure by Mr. Wagschal to Mr. Strulovitch to shield them from Mr. Wagschal's creditors," "the two men recogniz[ed] that Mr. Wagschal nevertheless would in effect be entitled to most or all of these Debtors' value and would have the major say in their management."  (*Id.*)

The Israeli Investors and the Operations LLC likewise have control over the properties owned by 325 Franklin, 618 Lafayette, 1213 Jefferson, and 106 Kingston. The Undisclosed Operating Agreements provide that the consent of 78% of the members of the Operations LLCs and CSRE LLC is required to change the ownership of these Debtors or their properties; hire a management company other than CSRE LLC; sell the properties; and dissolve the entities. (*See, e.g.*, A. 20-2–20-4.) Upon liquidation of the entities, the Operations LLC are entitled to 46% of the distribution of the assets of the entity. (A. 20-4.)

Similarly, Guttman, who owns 50% of the interests in 834 Metropolitan Avenue LLC, 92 South 4th LLC, and 1125-1133 Greene Avenue LLC, exercises authority over these Debtors insofar as they are not permitted to sell their properties without his consent. (A. 18-12 at 42:12–19.) Likewise, Eighteen Homes LLC was not permitted to sell, lease, or encumber its property without Greenfeld's consent, because Greenfeld holds a 50% ownership interest in that entity. (A. 27-2.)

## F.    The Encumbrance Defaults

Debtors 618 Lafayette and Eighteen Homes violated paragraphs 9 and 18(q) of the Mortgages by placing subordinate encumbrances on the properties securing the loan without Signature's consent.   (A. 17-38 at ¶ 63.)   The encumbrances remained outstanding for years—long after Brooklyn Lender noticed the defaults. (*Id.*)  The encumbrances were removed just before the Confirmation Hearing.  (*Id.*)

### G.    The Bankruptcy Cases

On May 20, 2019 and May 21, 2019 (collectively, the "Petition Date"), the Debtors commenced the Bankruptcy Cases by filing voluntary petitions (collectively, the "Petitions") for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  (*See* A. 1-1.)  The Bankruptcy Cases were jointly administered for procedural purposes.  (*See id*.)  The filing of the Petitions constituted additional events of default under the Mortgages.  (*See* A. 2-54.)

On August 9, 2019, Brooklyn Lender filed proofs of claim against each of the Debtors, asserting a claim in the aggregate amount of not less than $74,515,177.43 (the "Brooklyn Lender Proofs of Claim"), including default interest on account of the Debtors' defaults.  (*See, e.g.*, A. 2-1–2-177.)  On October 27, 2019, the Debtors filed partial objections to the Brooklyn Lender Proofs of Claim.  (*See* A. 3-1–3-24.)

On January 21, 2020, the Debtors filed their Amended Plan and Amended Disclosure Statement, which sought to pay off Brooklyn Lender's claims without default interest.  (*See* A. 1-1.)  On April 22, 2020, Brooklyn Lender filed an omnibus response to the Debtor's objection to Brooklyn Lender's claims and objection to confirmation of the Debtors' Amended Plan.  (*See* A. 4-1–4-67.)

Between August 3, 2020 and August 7, 2020, the Bankruptcy Court held a bench trial on, among other things, confirmation of the Debtors' Amended Plan and the Debtors' objections to Brooklyn Lender's claims.  (*See* A. 1-1–1-2.)  The Court

heard testimony from, among others:  Brooklyn Lender's manager David Aviram, Strulovitch, Wagschal, Stagnari, and Guttman.[7]  At the close of trial, the Bankruptcy Court directed the parties to brief the issue of whether banking laws required the disclosure of profits interests, noting that if such disclosure was required, the Ownership Defaults were material and would be enforced.  (A. 9-195-20–9-198:07.)  The parties briefed the issue.  (*See* A. 1-2.)

### H.   The Bankruptcy Court's Rulings

On February 19, 2021, the Bankruptcy Court issued the Bench Ruling and Order granting in part and denying in part the Debtors' partial objections to Brooklyn Lender's claims.  The rulings relevant to this appeal are as follows:

### 1.   Ruling on the Ownership Defaults

The Bankruptcy Court denied Brooklyn Lender's entitlement to accelerate, and disallowed Brooklyn Lender's claims for default interest, as to the Ownership Defaults.  Specifically, the Bankruptcy Court held that Brooklyn Lender "established that the ownership interests of Mr. Strulovitch's affiliates and relatives," including the ownership interests of Wagschal, Guttman, and the Operations LLC, "were not fully disclosed" "in or in connection with their loan applications."  (*Id.* at 37.)  It held, however, that the Ownership Defaults were not "the type of default that would

---

[7]     The parties agreed to designate Guttman's deposition testimony in lieu of calling him at trial.

serve as a basis for acceleration or enforcement of default interest." (*Id.*)  According

to the Court:

> New York law . . . places certain limitations on the ability
> of a creditor with a mortgage on real property to enforce,
> including by acceleration, certain types of defaults.  New
> York law generally categorizes loan defaults either as (a)
> payment, or monetary defaults, i.e. the failure to pay
> principal or interest when due or (b) non-monetary
> defaults, basically every other type of default.  Absent
> truly extraordinary circumstances such as lender
> misconduct or a de minimis delay in making a payment,
> New York law will not limit a lender's right to accelerate
> and enforce a loan based on its borrower's monetary
> default.
>
> New York has long recognized broader equitable
> exceptions to enforcing the parties' contract with respect
> to acceleration and non-monetary defaults, however.
> Generally, courts look to three factors:  has the lender
> suffered actual damages as a result of the default; has the
> default impaired the lender's security, that is, the collateral
> securing the debt; and does the default make the future
> payment of principal and interest less likely?  Courts also
> consider whether the default was inadvertent or
> insignificant, although in analyzing whether the default
> was insignificant or, to the contrary, material, they usually
> apply the foregoing three factors.

(*Id.* at 25–26 (internal citations omitted).)

Applying its formulation of New York law, the Bankruptcy Court determined

that the Ownership Defaults were not a valid basis for acceleration or default interest.

First, the loan documents did not "sufficiently solicit[] disclosure of ownership

interests." (*Id.* at 37.)  Second, the Debtors' failure to disclose did not affect

24

Signature or Brooklyn Lender's collateral or ability to be repaid, because (i) the loans were non-recourse; (ii) "Signature Bank relied upon the Debtors' properties' income stream, i.e. rental payments, and/or the value of the properties" to repay the loans; (iii) "[n]either Signature Bank nor Brooklyn Lender undertook a meaningful credit analysis of Mr. Strulovitch or any other disclosed owner"; and (iv) even as to Strulovitch, Signature did not "pay attention to his credit reports" and, although Signature required a financial statement from him, Signature would have found the dramatic increase in Strulovitch's net worth to be incredible because Aviram testified that he found such an increase incredible.  (*Id.* at 37–38.)

Third, although the Bankruptcy Court ruled that banking laws required the disclosure of ownership and profit sharing interests and non-disclosure "might put a lender at risk of [a] violation," it determined this was not a valid basis for acceleration or default interest because (i) "there is no evidence that Signature Bank conducted any such analysis as to the Debtors' disclosed owners"; (ii) "such a risk had no bearing on it or Brooklyn Lender being paid in full or risk of impairment of the collateral"; (iii) there was no evidence that Brooklyn Lender undertook any analysis or reporting to the applicable authorities; and (iv) "there is no suggestion that any of the third-party owners would in fact be the types of investor targeted by the applicable rules and regulations."  (*Id.* at 39–40.)

### 2.     Ruling on the Bankruptcy Defaults

The Bankruptcy Court determined that Brooklyn Lender was not entitled to post-petition default interest with respect to the Bankruptcy Defaults.   The Bankruptcy Court held that the bankruptcy default provision was not an unenforceable *ipso facto* provision prohibited by Section 365(e)(1) of the Bankruptcy Code.  (*Id.* at 23.)  It concluded, however, that Brooklyn Lender was not entitled to recover default interest because: (i) "[w]hen the only default was the bankruptcy filing itself, courts have properly held, that post-default interest should not be allowed under section 506(b)," and (ii) "there is no basis to allow a claim for postpetition default interest if there is no doubt that the lender will be paid in full and, in fact, the lender has been paid currently under its agreement."  (*Id.* at 23–24.)

### 3.     Ruling on the Encumbrance Defaults

The Bankruptcy Court allowed in part Brooklyn Lender's claim for default interest as to the Encumbrance Defaults.  The Bankruptcy Court found that Debtors 618 Lafayette and Eighteen Homes "violated sections 9 and 18(q) of those Debtors' loan agreements" by placing subordinate encumbrances on their properties; that "[s]uch encumbrances impaired Brooklyn Lender's interest in the collateral"; and that these violations "serve[d] as a valid basis for acceleration and the enforcement of default interest under New York law."  (*Id.* at 30–31.)  It determined, however, that "today Brooklyn Lender's security is not impaired by them," and limited

26

Brooklyn Lender's recovery of default interest to the period that the encumbrances appeared on county records.  (*Id.*; *see also* Order at 3.)

## STANDARD OF REVIEW

"A district court reviews a bankruptcy court's conclusions of law de novo, its discretionary decisions for abuse of discretion, and its findings of fact for clear error." *Wells Fargo Bank, N.A. v. Weidenbenner (In re Weidenbenner)*, No. 15-CV-244 (KMK), 2019 WL 1856276, at *2 (S.D.N.Y. Apr. 25, 2019) (reversing and remanding orders); *see also ASM Capital LP v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 582 F.3d 422, 426 (2d Cir. 2009) ("The bankruptcy court's legal conclusions are evaluated de novo; its findings of fact are subject to a clearly erroneous standard.").  Mixed questions of fact and law are subject to *de novo* review. *Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 90 (2d Cir. 2003). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

## ARGUMENT

## I. THE BANKRUPTCY COURT ERRED IN DETERMINING THAT THE OWNERSHIP DEFAULTS ARE NOT ENFORCEABLE UNDER NEW YORK LAW.

The Bankruptcy Court's conclusion that the Ownership Defaults are not a valid basis for acceleration or default interest, because they do not impair the

collateral or make the future payment of principal and interest less likely, is contrary to established law and fact.

**A.    The Bankruptcy Court Applied the Wrong Legal Standards In Determining that the Ownership Defaults Are Not Enforceable**

Under New York law, "when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms." *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004). The "parties to a loan agreement are free to include provisions directing what will happen in the event of default or acceleration of the debt, supplying specific terms that supersede other provisions in the contract if those events occur," including that "a default rate of interest will apply thereafter." *NML Capital v. Republic of Argentina*, 952 N.E.2d 482, 491 (N.Y. 2011).

The rule that agreements must be enforced in accordance with their terms has "special import in the context of real property transactions, where commercial certainty is a paramount concern and where," as here, "the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length." *Vt. Teddy Bear Co.,* 807 N.E.2d at 879. A court of equity "may not relieve a defaulting debtor from the consequences of his act merely because the results are harsh"— especially where the borrowers are "sophisticated businessmen capable of clearly expressing their intent." *In re CPG Constr. & Dev. Corp. v. 415 Greenwich Fee*

*Owner, LLC*, No. 102055/10, 2012 WL 10057890, at \*9–10 (N.Y. Sup. Ct. Mar. 12, 2012), *aff'd*, 986 N.Y.S.2d 467 (App. Div. 2014).

Indeed, the New York Court of Appeals has long held that "the interests of certainty and security in real estate transactions forbid [the court] in the absence of fraud, bad faith, or unconscionable conduct" to deny enforcement of an acceleration provision. *Graf v. Hope Bldg. Corp.*, 171 N.E. 884, 885 (N.Y. 1930). Courts' exercise of equitable powers to circumscribe or deny such enforcement should occur only in "rare cases" meriting extraordinary relief. *Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*, 389 N.E.2d 113, 116 (N.Y. 1979); *see also Key Int'l Mfg., Inc. v. Stillman*, 480 N.Y.S.2d 528, 530 (App. Div. 1984) (acceleration clauses "are quite common and are generally enforced according to their terms," except "in rare cases"), *aff'd as modified on other grounds*, 489 N.E.2d 764 (N.Y. 1985). Whether this rare, extraordinary relief is warranted in a particular case is fact specific, although certain categories of default are strictly enforced in New York, including defaults where control of the collateral is transferred, discussed below at Section I.B. Moreover, as set forth below at Section I.D, the standards governing the enforcement of an ***acceleration*** provision differ from those governing the enforcement of a ***default interest*** provision; default interest provisions are almost never susceptible to equitable considerations under New York law.

Further, equitable relief has "little applicability in the commercial setting because it is presumed that businessmen deal at arm's length with relative equality of bargaining power." *See Gillman v. Chase Manhattan Bank, N.A.*, 521 N.Y.S.2d 729 (App. Div. 1987), *aff'd*, 543 N.E.2d 824 (N.Y. 1988) (internal citations omitted); *see also Key Int'l Mfg.*, 480 N.Y.S.2d at 530 (rejecting equitable defenses where parties were "sophisticated entrepreneurs"). Unconscionable conduct is conduct that is "monstrously harsh" and "shocking to the conscience." *In re Downtown Athletic Club of N.Y.C., Inc.*, No. 98-B-41419-JLG 1998 WL 898226, at *10 (Bankr. S.D.N.Y. Dec. 21, 1998). A party's enforcement of the bargained-for contract terms, even where the results may be harsh, is not, by definition, unconscionable or bad faith. *See id.* at *10–11; *see also Jamaica Sav. Bank v. Cohan*, 320 N.Y.S.2d 471, 471 (App. Div. 1971) ("[I]t was not oppressive or in bad faith for plaintiff to accelerate the maturity date of the mortgage loan, as it was entitled to do, or to resort to the remedy which the law provides against a mortgagor in default.").

The Bankruptcy Court erred by ignoring, misstating, and misapplying the foregoing law. The Bankruptcy Court did not recognize that New York law provides that mortgage contracts are strictly enforced according to their terms absent exceptional circumstances involving fraud, bad faith, or unconscionable conduct— none of which are present here. (Bench Ruling at 25–26, 37–40.) Instead, the Bankruptcy Court determined that non-monetary defaults are unenforceable ***unless***

30

they impair the collateral securing the debt or make the future payment of principal and interest less likely.  (*Id.*)  This is not the law.  The Bankruptcy Court's misstatement of the legal standard improperly shifts the burden from Debtors to demonstrate fraud, bad faith, or unconscionable conduct warranting extraordinary relief from the rule—enforcement of a contract—to the lender to show that a normal-course contract, entered into by sophisticated parties, should be enforced.  Further, the Bankruptcy Court failed to recognize the differing standards governing the enforcement of acceleration and default interest provisions.  For these reasons alone, the Order should be reversed.

### B.   Defaults For False Statements of Ownership Are Enforceable Because They Necessarily Impair the Lender's Security and Make Payment of the Loan Less Likely

Even under the erroneous standard set forth by the Bankruptcy Court, its ruling should be reversed because, as a matter of New York law, the Ownership Defaults impair the lender's security and make payment of the loan less likely.  New York law is clear that the transfer of collateral or control of the collateral securing a loan, without the lender's consent, necessarily impairs the lender's security and likelihood of repayment.  Such transfer deprives the lender of its right "to determine whom they wish to accept as a debtor and owner of the security," *Stith v. Hudson City Sav. Inst.*, 866, 313 N.Y.S.2d 804, 808 (Sup. Ct. 1970); *Silver v. Rochester Sav. Bank*, 424 N.Y.S.2d 945, 947 (App. Div. 1980) (due-on-sale clauses reflect the

lender's "concern[ ] about the security of the mortgage upon the transfer of ownership of the property").

The lender is harmed by the unauthorized transfer because it cannot assess whether "the security property is transferred to a person whose ability to repay the loan and properly maintain the property is inadequate." *Fid. Fed. Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 146 (1982).  Indeed, the U.S. Supreme Court has confirmed this rationale supporting enforcement of due-on-sale clauses, finding that the failure to enforce such provisions could endanger the "the financial security and stability" of federally chartered savings and loan associations. *Id.* (federal regulations permitting federally chartered savings and loan associations to exercise due-on-sale clause preempted contrary state doctrine).

For this reason, the due-on-sale clause "is strictly enforced in New York," and is not susceptible to equitable defenses.  1 D. Kirk Drussel, et al., Mortgages and Mortgage Foreclosure in N.Y. § 28:13 (2020) (collecting cases); 1 Bergman on New York Mortgage Foreclosures § 4.11 (2020) ("[I]n New York the enforceability of due-on-sale provisions has always been virtually beyond dispute."); *see also Bonady Apartments, Inc. v. Columbia Banking Fed. Sav. & Loan Ass'n*, 472 N.Y.S.2d 221, 222 (App. Div. 1984) (trial court should have declared the due-on-sale clause valid and enforceable); *Beacon Fed. Sav. & Loan Ass'n v. Marks*, 457 N.Y.S.2d 881, 882 (App. Div. 1983) (upholding acceleration of a mortgage upon the mortgagor's

transfer of the property securing the mortgage to a third party without the mortgagee's prior consent, as provided by contract); *Newburgh Sav. Bank v. Grossman*, 462 N.Y.S.2d 92, 93 (N.Y. Sup. Ct. 1982) (absent language to the contrary in the mortgage, the mortgagee was afforded the "unrestricted right to declare the whole of the unpaid principal sum to be due in the event of a sale or conveyance of the subject premises"); *Stith*, 313 N.Y.S.2d at 808 (upholding acceleration of a mortgage upon the mortgagor's transfer of the property securing the mortgage to a third party without the mortgagee's prior consent, as provided by contract).

The Ownership Defaults are enforceable for the same reason.  Numerous investors (whose net worth, experience, and character as borrowers are unknown) held undisclosed or misrepresented interests in the properties and, in turn, controlled the properties serving as the security for the loans.  (*See supra* §§ A, D.)  In other words, Strulovitch, the purported owner, could not take certain actions with respect to the collateral without these owners' express authorization—necessarily impairing the collateral.  (*Id.*)  Further, because of the nondisclosure, Signature could not assess these undisclosed or misrepresented owners' real estate experience or their ability to care for and maintain the collateral.  (*Id.*)

The Ownership Defaults also affect the borrowers' ability to repay.  Stagnari testified that disclosure of ownership was required to assess the "financial

wherewithal" of the borrower.  (*See supra* § C.)  Signature's reports approving the loans are replete with assessments of Strulovitch's real estate experience, his extensive portfolio of real estate, his allocated cash flows, and his net worth, and how these factors and his financial contributions can "offset[]" "potential negative impact" of various risk factors that may decrease the cash flow of the particular property securing the loans.  (*See id*.)  In reality, however, Strulovitch was not the sole or majority owner of any of the borrowers, and had a far lower net worth and allocated cash flow than represented.   The existence of numerous undisclosed owners of the borrower changes the nature and character of the borrower at issue, as well as the overall lending relationship, and there was no way for Signature to assess whether the borrowers had the ability to repay the loan.[8]

### C.   The Bankruptcy Court's Determination that the Ownership Defaults Were Not Enforceable Were Based On Clearly Erroneous Factual Findings and a Misapplication of the Law.

The Bankruptcy Court's determination that the Ownership Defaults were not enforceable was based on clearly erroneous factual findings and a misapplication of the law.  First, the Bankruptcy Court made clearly erroneous factual findings that (1) Signature did not "sufficiently solicit" disclosure of the Debtors' ownership interests

---

[8]      The fact that the loans are non-recourse (with carve-outs for fraud) renders the accuracy of the ownership representations more—not less—important, as "[c]ontributions from the principal" are an entirely voluntary "Source of Repayment" so the lender must assess the "financial wherewithal" and the incentives for the borrower to contribute in the event of shortfalls in rent income.

and (2) Signature did not rely on the Debtors' ownership representations and Strulovitch's personal financial statement. (Bench Ruling at 37–38.) These factual findings are squarely contradicted by the plain language of the loan documents, Stagnari's testimony, and other documentary evidence. The Loan Documents demonstrate that Signature repeatedly required the Debtors to represent, warrant, and certify the accuracy and materiality of their ownership disclosures, and that the Debtors did so. (*See supra* § C.) Stagnari testified that Signature looked for and relied upon such representations. (*Id.*) And the COM Reports show that Signature relied on the Ownership Representations and the Signature PFS. (*Id.*) The Bankruptcy Court's factual finding that Signature did not sufficiently solicit the Debtors' ownership information or rely on such disclosure is therefore clearly erroneous. *See Metzen v. United States*, 19 F.3d 795, 805–06 (2d Cir. 1994) (trial court committed clear error where its findings were belied by documentary evidence and testimony); *Pfeiffer v. Silver*, 712 F.2d 799, 805 (2d Cir. 1983) (district court's factual finding was clearly erroneous where it was contradicted by witness's direct testimony).

The Bankruptcy Court found significant that Signature did not request a personal financial statement from Wagschal, although he was disclosed as a 50% owner of C&YSW. But Stagnari testified that Signature "may" require a personal financial statement from a 50% owner. (A. 8-58:07–8:59:06.) The only reason it

did not do so, in connection with the 2016 loan to C&YSW, was because the loan was a "refinance and increase on an existing [2012] loan" with Signature, and thus retained the same personal financial statement requirements as when the loan was first originated in 2012. (*Id.*) At that time, Wagschal was a 5% owner—which Signature deemed to be a "small interest." (A. 26-2.) The fact that Signature did not require a personal financial statement from a "small," 5% interest holder does not signify that Signature would not have required personal financial statements from the undisclosed owners of the other Debtors—who in each instance held much larger interests.[9] Moreover, as Stagnari testified, Signature would have required a personal financial statement from any managing member. (A. 8-58:7–18.) Of course, Signature never had the chance to require one from Wagschal, in connection with the loan to D&W and Meserole, because he was not disclosed as a Managing Member and was misrepresented as a 1% owner (when in fact he owned and controlled these Debtors as the Bankruptcy Court found). Signature needed to know about the existence of the other owners, and the actual extent and nature of their interest and role, in order to determine whether it would have required a personal financial statement, and here it simply did not have the necessary information.

---

[9]   The fact that Signature did not require a personal financial statement from Strulovitch's son, Moses Strulovitch (who purportedly owned a 1% interest in 119 Rogers and 127 Rogers) based on the incomplete information it had, is insignificant for the same reason.

The Bankruptcy Court's finding that Signature "would not have relied and in fact did not rely" on the Signature PFS because Aviram found increases in Strulovitch's net worth to be incredible is also clearly erroneous. (Bench Ruling at 38.)  Aviram is not a Signature employee, and, unlike Signature, he reviewed the Signature PFS with knowledge that Strulovitch had been accused of misrepresenting his interests in the LLCs at issue. (A. 17-4–17-20 at ¶¶ 27–36.)  What Aviram found incredible, with the benefit of the Federal Action allegations in mind, has no bearing on whether *Signature* relied on those representations (and Stagnari testified that Signature did rely—testimony that is further corroborated by the COM Reports (*see supra* § C)) or would have reason to believe that the Signature PFS were inherently incredible.  At the time Signature was underwriting the loans, the Federal Action had not yet been filed; thus Signature had no opportunity to assess the credibility of the Signature PFS against such allegations.[10]

Further, the Bankruptcy Court legally erred in determining that, although banking regulations required the disclosure of the Debtors' owners and that the

---

[10]    In any event, actual reliance is not required to enforce the breach of a representation and warranty. *CBS Inc. v. Ziff-Davis Publ'g Co.*, 553 N.E.2d 997, 999–1001 (N.Y. 1990) (buyer's disbelief in financial information that seller represented and warranted "shall be true and correct as of the time of the closing" did not preclude breach of warranty claim because the buyer need only have relied "on the express warranty as being a part of the bargain between the parties," and thus whether the buyer "believed . . . the assurances of fact made in the warranty" or harbored doubts about the truth of the warranted information was irrelevant).

Debtors' nondisclosure put Signature at risk of a violation, the Ownership Defaults were unenforceable because the undisclosed or misrepresented owners would not "in fact be the types of investor targeted by the applicable rules and regulations." (Bench Ruling at 40.)  This finding is at odds with (i) its own earlier determination that the Ownership Defaults were material, and enforceable, if the banking laws required disclosure of profits interests (A. 9-195:20–9-198:07); (ii) its own factual finding that Wagschal transferred assets to Strulovitch in name only to avoid his creditors (Bench Ruling at 36); (iii) the fact that Strulovitch is accused, in the Federal Action, of engaging in the type of fraud that these KYC laws are intended to detect (A. 24-1–24:51); and (iii) the sanctions laws are particularly concerned with foreign investors—like the Israeli Investors (A. 8-94:04–10).

That the Bankruptcy Court concluded—without evidence—that the Israeli Investors (or other owners whose identities are still unknown) may not actually be on sanctions list does not undercut the risk of liability to the lender arising from failure to disclose scores of foreign nationals within the ownership.  This is true because, among other reasons, the OFAC regulations contain no intent element; one who provides goods or services for the benefit of a sanctioned person is liable.  *See* OFAC, *Enforcement Information for October 5, 2018, available at* https://home.treasury.gov/system/files/126/jpmc_10050218.pdf  (bank  paid  $5 million to settle an enforcement action alleging that the bank failed to screen

beneficial interest holders who may derive some benefit from bank's services).  It is that risk of liability that establishes the materiality of the default, not liability itself.

The Ownership Defaults are not trivial or insignificant.   The ownership misrepresentations, going to risk assessment, "cannot be cured after they are made." *See MBIA Ins. Corp. v. Credit Suisse Sec. LLC*, No. 603751/2009, 2020 WL 7041787, at *6 (N.Y. Sup. Ct. Nov. 30, 2020) ("A post-closing corrective disclosure of a material misrepresentation generally does not make the loan less risky. . . . Informing the originator [of the true facts] after the loan has closed . . . does nothing to alleviate the loan's higher risk.").  Because Signature did not know about the other owners, it could not choose whether to lend to these borrowers or cede control over its security.  This is precisely the type of default that New York courts routinely enforce because unless the lender can freely choose the party to which it is lending, it has not had an opportunity to assess the actual borrower's experience, ability to repay the loan, and control over the collateral—necessarily impairing the lender's security and ability to be repaid.  *See Zona, Inc. v. Soho Centrale LLC*, 704 N.Y.S.2d 38, 38 (App. Div. 2000) (enforcing default for assignment of lease, finding that tenant's misrepresentation that Sagar owned 90 percent of its outstanding stock was "obviously material and central to the lease agreement" given the landlord's assertion that Sagar was central to the parties' commercial lease and that tenant

defaulted by assigning, without prior written consent, 25% of the capital stock of tenant).

All of the cases cited by the Bankruptcy Court involved highly technical defaults distinguishable from the default here. In *Karas v. Wasserman*, 458 N.Y.S.2d 280, 281–82 (App. Div. 1982), the case primarily relied upon by the Bankruptcy Court, the "inadvertent" and "inconsequential" defaults were the borrower's failure to furnish to the lender (1) an estoppel certificate stating the amount due on the mortgage and any offset or defenses against that amount (where the borrower was current on loans) and (2) the borrowers' receipts showing payment of taxes, insurance premiums, sewer rents, and assessments when due (where the borrower had actually made all such payments). Such technical defaults—involving the failure to furnish statements or receipts to prove that it had actually complied with the loan's terms—are distinguishable from the defaults here, which involve intentional deceit about the true owners of the collateral. *Compare with Zona Inc.*, 704 N.Y.S.2d at 38 *and MBIA Ins. Corp.*, 2020 WL 7041787, at *6.

The other cases cited by the Bankruptcy Court are likewise distinguishable as highly technical defaults that could not be said to impair the underlying collateral or likelihood of being repaid. *See Blomgren v. Tinton 763 Corp.*, 238 N.Y.S.2d 435, 437–38 (App. Div. 1963) (removal and replacement of refrigerators, stoves, and sinks from the mortgaged premises); *100 Eighth Ave. Corp. v. Morgenstern*, 164

N.Y.S.2d 812, 814 (App. Div. 1957) (borrower's "inadvertent" failure to sign a timely issued and otherwise sufficiently funded debt service check); *Rockaway Park Series Corp. v. Hollis Automotive Corp.*, 135 N.Y.S.2d 588, 589-90 (N.Y. Sup. Ct. 1954) (housing violations urged as basis for foreclosure had been filed 14 years prior to mortgagor's purchase of premises and mortgagee delayed enforcing mortgage until after violations were removed); *Tunnell Publ'g Co. v. Straus Comm'ns., Inc.*, 565 N.Y.S.2d 572, 574 (App. Div. 1991) (transfer of defendant's business to a substantially similar entity that was structured as a limited partnership, with same principals and same proportion of ownership interests, for tax purposes); *Empire State Bldg. Assoc. v. Trump Empire State Partners*, 667 N.Y.S.2d 31, 33, 35 (App. Div. 1997) (provision providing that the lessee shall "not expose the Lessor to criminal liability" not implicated where lessee was alleged to have made a hypertechnical misrepresentation to the Department of Buildings concerning whether one of the building's more than 86 floors had a separate air conditioning system).

Accordingly, the Bankruptcy Court's determination that the loans were not validly accelerated under New York law because they do not impair the collateral or impair the lender's ability to be paid is erroneous as a matter of fact and law.

41

**D.     The Bankruptcy Court Erred By Disallowing Default Interest On Account of the Ownership Defaults**

Even if the Bankruptcy Court were correct that equitable considerations here allowed it to refuse to enforce the acceleration provision (which it was not), the Bankruptcy Court may not cancel default interest provided for by the parties' contract.  No authority allows the Bankruptcy Court to reduce pre-petition default interest, absent wrongful conduct, under New York law.  As the Second Circuit has explained, "[p]repetition interest is generally allowable [as a claim] to the extent and at the rate permitted under the applicable nonbankruptcy law, including the law of contracts."  *Key Bank Nat'l Ass'n v. Milham (In re Milham)*, 141 F.3d 420, 423 (2d Cir.), *cert. denied*, 525 U.S. 872 (1998); *In re 785 Partners LLC*, 470 B.R. 126, 131 (Bankr. S.D.N.Y, 2012).

Under New York law, "[i]t is well settled that an agreement to pay interest at a higher rate in the event of default or maturity is an agreement to pay interest and not a penalty." *Jamaica Sav. Bank, FSB v. Ascot Owners, Inc.*, 665 N.Y.S.2d 858 (App. Div. 1997); *see also Union Estates Co. v. Adlon Constr. Co.*, 116 N.E. 984, 985 (N.Y. 1917) ("[A]n agreement to pay interest upon a loan from its date until its payment at a rate before and a differing rate after its maturity is an agreement to pay interest and not a penalty as to the latter rate."). A higher rate of default interest reflects the allocation of risk as part of the bargain struck between the parties, a bargain that benefits the obligor as well as the obligee. *See Ruskin v. Griffiths*, 269

42

F.2d 827, 832 (2d Cir. 1959) (observing that "[a] variable interest provision in event of a stated default . . . is not a penalty, nor should it be considered unconscionable . . . . It can be beneficial to a debtor in that it may enable him to obtain money at a lower rate of interest than he could otherwise obtain it"), *cert. denied*, 361 U.S. 947 (1960); *see also* Bench Ruling at 17.

Even where the default rate strikes the judge as high, a court cannot rewrite the parties' bargain based on its own notions of fairness and equity. *See In re Woodmere Invs. Ltd. P'ship*, 178 B.R. 346, 355 (Bankr. S.D.N.Y. 1995) ("[W]hen two sophisticated parties enter into a contract calling for an established rate on default, this Court will not disturb the agreement absent persuasive evidence of overreaching."); *cf. Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992) ("A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous . . . nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." (citation omitted)); *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 171 (N.Y. 2002) ("[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity.").

Courts may not cancel default interest that has accrued even where the default is non-monetary, and a lender is entitled to such interest without regard to actual

damages.  For instance, in *In re 1111 Myrtle Ave. Grp., LLC*, 598 B.R. 729, 741 (Bankr. S.D.N.Y. 2019), the court rejected the Debtors' argument that the default rate was an unenforceable penalty, even where the defaults were non-monetary, the Borrower "never incurred a monetary default under the Note and Mortgage" and was current in paying "all undisputed amounts under the Plan."  The court explained:

> That there were *in fact* minimal or no monetary losses to the Lender does not retroactively render the interest unwarranted, because default interest serves future-looking purposes.  To tie the legitimacy of default interest to questions of whether or not the contemplated risks actually materialized would defeat the very purpose of default interest provisions.  An insured is not entitled to reimbursement on her premiums simply because she did not make use of the insurance.  Such is the cost of risk.

*Id*.  (citation omitted).

The Bankruptcy Court erred by conflating the analysis of acceleration and default interest, and failing to recognize, in accordance with the foregoing law, that default interest provisions are almost uniformly enforceable.  All of the New York cases cited by the Bankruptcy Court regarding the purported requirement that defaults must impair security or repayment to be enforceable all relate to acceleration, not default interest.  (*See* Bench Ruling at 25-26.)  In other words, even if true that the Ownership Defaults do not impair the collateral or the ability to be repaid (which it is not), this alone is not a basis for the denial of default interest.

*In re Heavey*, 608 B.R. 341, 348–52 (Bankr. E.D.N.Y. 2019), the only case the Bankruptcy Court cited in the context of equitable relief from the enforcement of pre-petition default interest, confirms that pre-petition interest may be limited for equitable reasons only where the foreclosing party has engaged in "wrongful conduct." *Id.* at 349. The examples of wrongful conduct cited by *Heavey* involve the lender's delays in foreclosure actions. No delay has been alleged or found here. Nor has the Bankruptcy Court found that Brooklyn Lender engaged in any other type of wrongful conduct. Instead, the Bankruptcy Court found that the Debtors defaulted by misrepresenting their ownership at loan origination. A party's enforcement of bargained-for contract terms, even where the results may seem harsh, is not unconscionable or bad faith. *See In re Downtown Athletic Club of N.Y.C., Inc.*, 1998 WL 898226, at *10–11; *see also Jamaica Sav. Bank*, 320 N.Y.S.2d at 471 ("[I]t was not oppressive or in bad faith for plaintiff to accelerate the maturity date of the mortgage loan, as it was entitled to do, or to resort to the remedy which the law provides against a mortgagor in default."). And it is not wrongful for a party to pursue default interest or purchase a loan with the intent to default where, as here, there was in fact a default. *See In re Downtown Athletic Club of N.Y.C., Inc.*, 1998 WL 898226, at *11; *see also* Bench Ruling at 19.

Accordingly, there was no basis to limit or cancel default interest arising from the Ownership Defaults.

**E.      Allowing the Bankruptcy Court's Ruling to Stand Would Erode the Stability of Scores of Credit Agreements Providing that a Material Misrepresentation By the Borrower In Connection With the Loan Is An Event of Default**

The Bankruptcy Court's ruling that a lender cannot accelerate a loan, or recover default interest, based on a default for a material misrepresentation, despite the plain terms of the contract, would erode the stability of numerous credit agreements that contain such a provision.  Paragraph 18(g) of the Mortgages is a standard-form clause in default provisions found in scores of mortgages and other credit documents.  *See, e.g.*, *PHL Variable Ins. Co. v. Town of Oyster Bay,* No. 16-CV-4013 (SJF)(AKT), 2017 WL 2371188, at *7 n.6 (E.D.N.Y. May 30, 2017) ("Security Agreement provides, in pertinent part, that '[a]n Event of Default shall occur if . . . Any representation, warranty, certification or statement . . . shall prove to have been misleading or incorrect in any material respect'"); *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, No. 11 CIV. 2375(JSR), 2011 WL 5335566, at *3 (S.D.N.Y. Oct. 31, 2011) (event of default occurs where "any representation or warranty made by any party hereto under this Agreement . . . shall prove to be untrue or incorrect in any material respect"); *Metro Funding Corp. v. West LB AG*, No. 10 CIV.1382 (CM), 2010 WL 1050315, at *5 (S.D.N.Y. Mar. 19, 2010) (event of default occurs where "any representation, warranty, certification or statement . . . shall prove to have been false or incorrect in any material respect when made"); *In re Enron Corp.*, 302 B.R. 463, 476 (Bankr. S.D.N.Y. 2003) ("an 'Enron Event'

occurs when '[a]ny representation or warranty . . . shall prove to have been incorrect in any material respect'"), *aff'd*, No. 04-CIV.1367 (NRB), 2005 WL 356985 (S.D.N.Y. Feb. 15, 2005); *see also* 21A West's Legal Forms, Real Estate Transactions, Commercial § 25:27 (form commitment letter termination right arises where "any statement, representation or warranty . . . shall prove to have been untrue or misleading when made in any material respect").

Lenders must be allowed to rely on the enforcement of provisions providing that a false or misleading representation made in connection with a loan is an event of default.  Without commercial certainty that such provisions will be enforced by the Courts, they have no practical utility, leaving the market with no means of ensuring that borrowers make true, accurate, and complete representations at loan origination or in statements furnished under a loan.  This is a particularly troubling outcome in cases—like this one—where the borrower's intentionally false statements about a material term of the loan exposed the lender to significant risk of liability under AML, sanctions, and KYC regulations; fundamentally change the considerations upon which the lender agreed to lend; and impair the collateral and the lender's ability to choose the party to whom it lends.  That is not, and cannot be, the law.

Indeed, courts applying New York law have enforced default provisions substantially similar to one here.  *Chase Manhattan Bank v. Motorola, Inc.*, 184 F.

Supp. 2d 384, 387, 394 (S.D.N.Y. 2002) (enforcing similar default provision, triggering performance of a $300 million guarantee obligation, where borrower made misrepresentation in a certificate issued in connection with a credit agreement); *Fontainebleau Las Vegas, LLC v. Bank of Am., N.A. (In re Fontainebleau Las Vegas Holdings, LLC)*, 417 B.R. 651, 665–66 (S.D. Fla. 2009) (provision providing that an event of default occurred if "any representation or warranty . . . shall prove to have been inaccurate in any material respect" was enforceable, such that lender would have been entitled to refuse to disburse funds on a revolving loan agreement).  The Bankruptcy Court's denial of Brooklyn Lender's right to accelerate and recover default interest on account of the Ownership Defaults thus should be reversed.

## II. THE BANKRUPTCY COURT ERRED BY DISALLOWING DEFAULT INTEREST ARISING FROM THE BANKRUPTCY DEFAULTS.

Bankruptcy Code Section 506(b) provides that an oversecured creditor is entitled to interest on its secured claim as provided under the agreement under which such claim arose.  Here, the parties' agreement provides that it shall be an event of default "if any petition for bankruptcy . . . shall be filed . . . by the Mortgagor," upon which Brooklyn Lender is entitled to interest at the default rate.  (*See, e.g.*, A 2-54.)  Bankruptcy default clauses are enforceable under New York law. *First Nationwide*

*Bank v. Brookhaven Realty Assocs.*, 637 N.Y.S.2d 418, 421 (2d Dep't 1996) ("a bankruptcy default clause is enforceable under the laws of this State").

The Bankruptcy Court erred, as a matter of law, in holding that Brooklyn Lender was not entitled to default interest where the Debtors are current on payment and the only default was the bankruptcy filing.[11]  Payment of post-petition default interest is required where debtors are solvent and such payment would not harm any unsecured creditors.  *Ruskin*, 269 F.3d at 832 (reversing district court where it refused to enforce payment of interest at the default rate for a bankruptcy default). Indeed, courts in this Circuit have determined that "before there is a return to equity in a reorganization case, creditors should receive interest as compensation for the delay of the bankruptcy process."  *In re Gen. Growth Props., Inc.*, 451 B.R. 323, 326 (Bankr. S.D.N.Y. 2011).  Solvent debtors are required to pay post-petition default interest, for it would be "the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act."  *Id.* (quoting *Ruskin*, 269 F.2d at 832.).

---

[11]    The Bankruptcy Court erroneously assumed that the Debtors' only default was the filing of the Chapter 11 petitions.  The fact that the Bankruptcy Court denied Brooklyn Lender's right to accelerate the loans and recover default interest on equitable bases does not mean that the Debtors did not default in the first place under the plain terms of the parties' agreements.  At the very minimum, the Bankruptcy Court should have required the Debtors to pay interest at the default rate following the filing of the petition, given that the Debtors had in fact earlier defaulted under the Mortgages.

The fact that the Debtors were current on payments is not a basis for refusing to enforce default interest. *See In re 1111 Myrtle Ave. Grp., LLC*, 598 B.R. at 741 (enforcing default interest for the debtors' bankruptcy default where the debtors were current on payments). Additionally, courts in this Circuit have required payment of interest at the contract default rate even where the only event of default was the bankruptcy filing. *See, e.g.*, *Ruskin*, 269 F.2d 827; *Gen. Growth Props.*, 451 B.R. at 324 (requiring payment of interest at the default rate where the only event of default was the debtors' commencement of the bankruptcy case and the debtors were current on payment). Indeed, the Second Circuit explained in *Ruskin*: if lenders could not rely on the courts to enforce default interest provisions, they would have "to anticipate a possible loss in the value of the loan due to his debtor's bankruptcy or reorganization, [and lenders] would need to exact a higher uniform interest rate for the full life of the loan," unnecessarily increasing the cost of credit for all borrowers. 269 F.2d at 832.

Each of the cases that the Bankruptcy Court relied upon in its ruling is distinguishable. The courts in those cases found that the debtors were insolvent and payment of default interest would harm unsecured creditors. *See In re Residential Cap., LLC*, 508 B.R. 851 (Bankr. S.D.N.Y. 2014) (partially denying default interest because Debtors were insolvent and payment of default interest would harm other creditors); *In re Vest Assocs.*, 217 B.R. 696, 703–04 (Bankr. S.D.N.Y. 1998)

(denying default interest because the Debtors were likely insolvent (without prejudice to the creditor renewing its claim for default interest in the event there was a surplus after paying other creditors)); *In re N.W. Airlines Corp.*, No. 05–17930 (ALG), 2007 WL 3376895, at *6 (Bankr. S.D.N.Y. Nov. 9, 2007) (denying default interest because there was "no question as to the insolvency of the Debtors and the fact that the recovery of other creditors would be diminished by a grant of default interest"); *In re Bownetree, LLC*, No. 1–08–45854–dem, 2009 WL 2226107, *4 (Bankr. E.D.N.Y. July 24, 2009) (denying default interest because debtors were insolvent and payment of default interest would have reduced recovery to unsecured creditors).[12]

In contrast, here the Bankruptcy Court found that the Debtors are solvent. (Bench Ruling at 18.)  The Bankruptcy Court also found that "most other creditors, besides Brooklyn Lender, appear to be insiders," and that the Israeli Investors, who asserted the largest claim, "have not sought to reduce Brooklyn Lender's claim" (Bench Ruling at 43-44.)  Payment of default interest for the Bankruptcy Defaults would not harm the other creditors.  At most it would reduce the recovery to the Debtors' equity holders, which is not a basis for denying default interest.  *See 785*

---

[12]    The Bankruptcy Court correctly declined to follow the portion of *Bownetree* determining that the enforcement of a bankruptcy default provision would be tantamount to enforcement of an *ipso facto* provision.  (Bench Ruling at 23-24.)

*Partners LLC*, 470 B.R. at 134 ("[R]educing the contract [default] interest payable by a solvent debtor would unfairly grant a windfall to its equity."); *see also In re Sultan Realty, LLC*, No. 12-12-0119 (SMB), 2012 WL 6681845, at *7 (Bankr. S.D.N.Y. Dec. 21, 2012) (refusing to reduce default interest because "Sultan is solvent, and the application of the default rate will not prejudice its creditors," and instead "would unfairly grant a windfall to its equity") (citation omitted).

Accordingly, the Bankruptcy Court's decision disallowing default interest on account of the bankruptcy defaults should be reversed.

## III.   THE BANKRUPTCY COURT ERRED IN LIMITING DEFAULT INTEREST ON THE ENCUMBRANCE DEFAULTS.

The Bankruptcy Court determined that Debtors 618 Lafayette and Eighteen Homes defaulted under the Mortgages by placing subordinate encumbrances on the property.  (Bench Ruling at 30–31.)  The Bankruptcy Court further determined that Brooklyn Lender was entitled to accelerate, and recover default interest, on account of the Encumbrance Defaults because such defaults impaired its security.  (*Id.*)  Nevertheless, the Bankruptcy Court limited Brooklyn Lender's recovery of default interest to that period of time during which the subordinate encumbrances appeared on county records.  (*Id.*)

The Bankruptcy Court erred as a matter of law.  Acceleration is "[t]he advancing of a loan agreement's maturity date so that payment of the entire debt is due immediately."  *NML Capital*, 952 N.E.2d at 491 (quoting Black's Law

Dictionary 12 (9th Ed. 2000)).  The Bankruptcy Court, by partially disallowing default interest, de-accelerated the loans and reinstated their original maturity date. But having determined that Brooklyn Lender validly accelerated the Debt on account of the Encumbrance Defaults, the Bankruptcy Court may not de-accelerate the Debt or reinstate the original maturity date without requiring the Debtor to pay interest at the Default Rate through the date of the reinstatement.  *See, e.g.*, *In re Gen. Growth Props., Inc.*, 451 B.R. 323 (Bankr. S.D.N.Y. 2011) (to cure its default and reinstate the loan, debtor was required to pay interest at the default rate); *In re 139-141 Owners Corp.*, 313 B.R. 364, 368 (S.D.N.Y. 2004) (debtor is not permitted to de-accelerate and reinstate the pre-default maturity of the loan without payment of default interest).

Moreover, the Debtors' failure to pay the Debt when validly accelerated in June 2017 was a payment default, further entitling Brooklyn Lender to interest at the Default Rate.  (*See, e.g.*, A. 2-59 ("The Mortgagor hereby agrees that upon its failure to pay the Debt on the maturity date the Mortgagor will pay to the Mortgagee interest on the then unpaid principal at the Default Rate from the maturity date and until the actual receipt and collection of the Debt by the Mortgagee.").)  As the Bankruptcy Court itself determined, "New York law will not limit a lender's right to accelerate and enforce a loan based on its borrower's monetary default."  (Bench Ruling at 25.)

There is thus no basis to limit default interest arising from the Encumbrance Defaults under New York law.[13]

Nor is there any basis to limit default interest under Section 506(b). Section 506(b) provides that an oversecured creditor is entitled to default interest on its secured claim as provided by the agreement under which the claim arose. (*See supra* § II.) The Bankruptcy Court already determined that Section 506(b) equitable considerations do not warrant reduction of default interest with respect to the Encumbrance Defaults. (Bench Ruling at 43–44.) Accordingly, the Bankruptcy Court's decision reversing acceleration of the loans on account of the Encumbrance Defaults, and limiting default interest, should be reversed.

## CONCLUSION

Based on the foregoing, Brooklyn Lender respectfully requests that this Court reverse the Bankruptcy Court's Order.

---

[13] Additionally, the Bankruptcy Court did not cite any case where the accrual of default interest was limited to the period during which the encumbrances remained of record, despite the clear terms of the parties' agreement—and certainly not where the default remained willfully uncured years after it was first noticed. And Brooklyn Lender is aware of no such case.

Dated:      May 6, 2021
              New York, New York

                    KASOWITZ BENSON TORRES LLP

                    By:  /s/ Jennifer S. Recine
                           Jennifer S. Recine
                           David S. Rosner
                           Matthew B. Stein
                           Andrew H. Elkin
                           Tiffany L. Ho
                           1633 Broadway
                           New York, New York 10019
                           Tel: (212) 506-1700
                           Fax: (212) 506-1800

                    *Counsel for Brooklyn Lender LLC*

**Certificate of Compliance With Rule 8015(a)(7)(B)**

This brief complies with the type-volume limitation of Rule 8015(a)(7)(B) because this brief contains 12,908 words, excluding the parts of the brief exempted by Rule 8015(g).

Dated:      May 6, 2021
            New York, New York

KASOWITZ BENSON TORRES LLP

By:  /s/ Jennifer S. Recine
        Jennifer S. Recine
        David S. Rosner
        Matthew B. Stein
        Andrew H. Elkin
        Tiffany L. Ho
        1633 Broadway
        New York, New York 10019
        Tel: (212) 506-1700
        Fax: (212) 506-1800

*Counsel for Brooklyn Lender LLC*